UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARTIN A. LEWIS,

        Petitioner,

v.                                    CASE NO.  04-CV-71140-DT
                                      HONORABLE LAWRENCE P. ZATKOFF

DOUGLAS VASBINDER,

        Respondent.

_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION
## AND DECLINING TO GRANT A CERTIFICATE OF APPEALABILITY

Petitioner Martin A. Lewis has filed a *pro se* application for the writ of habeas corpus under

28 U.S.C. § 2254.  Respondent Douglas Vasbinder urges the Court in a responsive pleading to deny

the habeas petition.  The Court agrees with Respondent that Petitioner's claims do not warrant

granting the writ of habeas corpus.  For the reasons stated below, the petition for writ of habeas

corpus is DENIED.


## I.  Background

### A.  State Court Proceedings and Statement of Facts

Petitioner was charged in Kalamazoo County, Michigan with open murder.  The charge arose

from

the 1980 beating death of Cornell Smith.  The incident occurred at about 10:30 p.m.
on July 31, 1980 on the grounds of the Woodward School in Kalamazoo County.
Witnesses saw two cars pull up to the school.  The assailant got out of one car and
approached the other car.  An argument ensued, during which the assailant returned
to his car and retrieved a baseball bat.  The driver of the second car subsequently
drove off, leaving the victim, who had been his passenger.  The assailant chased the

victim, and, according to witnesses, inflicted a fatal blow to the victim's head with a full swing of the bat.

*People v. Lewis*, No. 230887, slip op. at 1 (Mich. Ct. App. Dec. 27, 2002).

Petitioner was taken into custody shortly after the incident and was placed in a lineup. Carl Dixon, who was Cornell Smith's companion on the night of the murder, viewed the line-up and stated that Petitioner looked and sounded like the man with the bat, but he was not sure of his identification. No warrant was obtained for Petitioner's arrest, and he was released from custody without any charges being filed against him. In 1999, a law enforcement team re-opened the case and began to re-interview witnesses. Petitioner was then charged with murdering Smith. The prosecutor's theory was that Petitioner premeditated the murder or committed the murder during a larceny or attempted larceny. Evidence adduced at trial established that Smith had been paid on the day of his death, but no wallet or paper money was found on him even though he ordinarily carried a wallet.

Gail Johnson testified that she was eleven years old in 1980. She and her cousins were present at the Woodward School on the evening of July 31, 1980. She saw Cornell Smith arguing with some people who pulled up in a car. One man ran to the car and got a bat, which he swung at Smith. The man hit Smith in the upper part of his body. Then, everybody left the area. The person who hit Smith ran away. Later, Ms. Johnson saw the same man climb over a fence and deposit the bat in the bushes. She did not know Petitioner, but when a detective came to see her in January 2000, she identified Petitioner in a photograph of the line-up held in 1980.

Angel Thompson and Ken Bostic also saw the altercation at the school. Angel heard one of the men say, "I'm going to kill you," and she saw a man strike Cornell Smith with something that sounded like a pipe. Ken saw the man go to the car, open the trunk, take out a bat or piece of wood,

and hit Smith until he fell to the ground. The man then checked Smith's pockets and left.

Randy Olsen and Daniel Bell were college students who lived directly across the street from Woodward School in 1980. They testified that a blue Ford Granada and a big brown sedan pulled up to the school on July 31, 1980. An argument ensued. The man who had gotten out of the Ford Granada went to the trunk of the car and retrieved a baseball bat. Then one of the two cars left the area, and the man with the bat chased the person who was left behind. Olsen thought he heard the aggressor say, "I'm going to kill you, Cornell" as he chased the victim. The aggressor swung and hit the victim in the head with the bat.

Roy Wilkinson was standing not far from the school on July 31, 1980, when he saw a man step out of the bushes with a baseball bat or club in his hand. The man stared at Wilkinson like he was angry with him. Then the man tapped the bat and took off. About five or six months before the trial in 2000, a detective showed a picture of the 1980 line-up to Wilkinson, who stated that the third man in the lineup had eyes similar to the person he had seen on July 31, 1980.

Wylene Betty Bennett testified that, on July 31, 1980, Petitioner came to her home and informed her son that he thought he had killed someone. Ms. Bennett told her brother, who was a police officer, what she thought she had heard Petitioner say. Ms. Bennett's son, Kenneth Garland, testified about the same incident. According to Kenneth, Petitioner came to his mother's house and said that some guys had jumped him and that he hit one of the men and may have killed him.

Ms. Bennett's other son, Donald Garland, testified that, some time after the killing, Petitioner said they had robbed a guy and he hit the guy in the head with a bat and that two kids saw it. Donald explained that, about a week before the killing, Petitioner and George Armstead had discussed a scheme that involved luring a victim under the pretense of selling a car and then robbing the person.

Petitioner's girlfriend in 1980 was Gwendolyn Harper. She owned a blue Ford Granada and lived less than a block from Woodward School. She claimed that Petitioner sometimes used her car, but he always borrowed her keys when he needed the car. She testified that Petitioner had told her he was going to play cards on the evening of July 31, 1980. She went shopping, came home in the early part of the evening, but went out again later that night. She drove past Woodward School where a police officer informed her that her car had been seen in the area shortly before an incident at the school.

Detective Richard Mattison testified that he was assigned to the cold case team. In 2000, he showed a photograph of the 1980 line-up to Gail Johnson and Roy Wilkinson. Within two or three seconds, Ms. Johnson pointed to Petitioner in the third position and said, "That's him." Wilkinson viewed the photograph of the line-up on a separate occasion. He informed Detective Mattison that the individual in position number three had the eyes and facial expression of the person he had seen on July 31, 1980. Mattison admitted that he may have told both Johnson and Wilkinson that the person he suspected of the crime was among the individuals in the picture.

Carl Dixon testified that he and Cornell Smith were drinking and feeling the effects of alcohol on July 31, 1980, when they attempted to turn around their car at Woodward School. A man in a blue car pulled up, jumped out of the car, and announced that Dixon had hit his car. The man grabbed Dixon. At the same time, another man confronted Cornell. Dixon fell down, and his assailant said, "I got something for you." Then the man went to his car and got a bat. Dixon panicked and got in his car as the man approached with the bat. The man jumped on his car, but fell off when Dixon drove away. As Dixon left the area, he saw the man walking toward the school where Cornell was standing.

The next day, a detective showed some photographs to Dixon. Dixon told the detective that Petitioner's photograph looked familiar, but he could not say for sure whether the person was his assailant. Later, he viewed a line-up with seven people in it. One person looked familiar, and he asked to have the men in the line-up say, "Look what you did to my car." He told the detective that the third man in the line-up (Petitioner) may have been his assailant, but he could not be sure. In 1999, he viewed a photograph of the line-up, and, at trial in 2000, he positively identified Petitioner as the person who had grabbed him on July 31, 1980.

Police Officer Rory Heckman corroborated Carl Dixon's testimony regarding the photo array and line-up. Heckman also testified that he arrested Petitioner on the basis of information that he acquired from Dixon and Police Officer Harold West, who was Wylene Betty Bennett's brother. At the police station, Petitioner waived his rights and informed Heckman that he had injured his fingers in a dice game. Petitioner subsequently informed Officer Heckman that he wanted to clear up what he had said about his injured fingers. Petitioner then stated that he injured his fingers when he stumbled and fell. The parties stipulated that, if Raymond Lett testified, he would say that he was in jail with Petitioner on August 1 or 2 of 1980 and that Petitioner had said he cut his hands at work where they got caught in a belt. Heckman requested a warrant for Petitioner's arrest, but his request was denied and Petitioner was released.

George Armstead testified that he was Petitioner's brother-in-law and friend in 1980. Armstead claimed that he dropped Petitioner off near Woodward School about 10:20 p.m. on July 31, 1980. He picked up Petitioner later that evening. Petitioner then told Armstead that he had been in a fight with a guy over a light for a cigarette. Petitioner said that he hit the guy on the head with a stick or bat in front of the school and he thought he may have killed him. On a subsequent

occasion, Petitioner approached Armstead and said, "You didn't tell the cops, did you?" And a couple months after the second conversation, Petitioner said that he still thought about the guy he had hit over the head and killed and that he would have to live with the memory for the rest of his life.

Petitioner waived his right to trial by jury and did not testify or present any witnesses. His defense was that the witnesses' testimonies were inconsistent and that the prosecution's proofs were insufficient to establish guilt beyond a reasonable doubt.

On September 7, 2000, the trial court found Petitioner guilty of first-degree, premeditated murder. *See* MICH. COMP. LAWS § 750.316. The court sentenced Petitioner to mandatory life imprisonment without the possibility of parole. The Michigan Court of Appeals affirmed Petitioner's conviction, and on November 24, 2003, the Michigan Supreme Court denied leave to appeal. *See People v. Lewis*, 671 N.W.2d 880 (2003) (table).

## B. Federal Court Proceedings

Petitioner filed his habeas corpus petition and supporting brief on May 11, 2004, and an amended memorandum of law three months later. The claims, as set forth in the amended memorandum of law, read:

I.      The trial court reversibly erred by basing its decision, in part, on testimony produced by unconstitutionally suggestive identification procedures.

II.     All three purported identifications must be excluded as the result of unconstitutional pretrial procedures.

    A.      All of the identification testimony should have been suppressed as the fruit of a warrantless arrest, in violation of the state and federal constitutions.

    B.      The identification testimony should also have been

suppressed because of the absence of counsel when witnesses were shown photographs of the 1980 lineup.

C. Petitioner was denied his state and federal constitutional right to the effective assistance of counsel because trial counsel failed to move to suppress the tainted lineups.

III. The trial court's factual findings were clearly erroneous in light of the testimony at trial.

IV. The trial court violated the court rules and impermissibly interfered with Mr. Lewis' right to present a defense by obstructing defense impeachment by prior convictions for theft or dishonesty.

V. Petitioner was denied his due process and state-created rights to an expert witness to challenge the questionable identification testimony.

VI. Petitioner was denied his state and federal constitutional rights to a fair trial when the state prosecuting attorney knowingly and intentionally with reckless disregard for the truth presented false testimony.

VII. Petitioner was denied his state and federal constitutional rights to a fair trial when: Ms. Gail Johnson, a prosecution key witness was allowed to make an in-court identification of Petitioner without the prosecution first establishing that Ms. Johnson's in-court identification testimony has an independent basis of reliability absent the 1980 line-up procedure and the photograph deriving therefrom.

Petitioner incorporates by reference his state appellate court brief for claims VI and VII.

Respondent filed a motion for summary judgment on the ground that Petitioner had not exhausted state remedies for two of his claims. The Court agreed that Petitioner did not exhaust state remedies for his claim that defense counsel was ineffective for failing to impeach witnesses with prior convictions, see page 30 of Pet. for Writ of Habeas Corpus, and his claim that defense counsel failed to procure an expert witness. *See id.* at 3. However, because Petitioner offered to

delete the unexhausted claims, the Court denied Respondent's motion for summary judgment and ordered him to file an answer to the habeas petition. Respondent has filed an answer, and Petitioner has filed a reply. The issues are now ready to be adjudicated.

## II. Standard of Review

Habeas petitioners are entitled to the writ of habeas corpus only if they can show that the state court's adjudication of their claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. Section "2254(d) dictates a highly deferential

8

standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted). "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005) (citing 28 U.S.C. § 2254(e)(1)).

## III. Discussion

### A. The Identifications of Petitioner

The first, second, and seventh habeas claims challenge the pretrial identification procedures and the witnesses' identifications of Petitioner. The first claim alleges that the trial court erred by basing its decision, in part, on testimony that resulted from suggestive identification procedures. The second habeas claim alleges that the identification testimony should have been suppressed because (1) the testimony was the fruit of a warrantless arrest and (2) there was no attorney present when witnesses were shown a photograph of the 1980 lineup. In addition, Petitioner alleges that his trial attorney was ineffective for failing to move to suppress the tainted lineups. The seventh habeas claim alleges that the prosecution failed to show that Gail Johnson's in-court identification of Petitioner had an independent basis of reliability.

### 1. Carl Dixon's In-Court Identification

Petitioner alleges that Dixon's in-court identification of him was based on suggestive pretrial identification procedures and should have been suppressed. The Michigan Court of Appeals reviewed this claim for plain error because Petitioner did not challenge the identification procedures

in the trial court, nor object to the identification testimony at trial.[1]  The state court of appeals went

on to stay that the photo array and line-up were not unnecessarily suggestive and that there was an

independent basis for Dixon's in-court identification.

The United States Court of Appeals for the Sixth Circuit recently explained that

> [t]he admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188, 197 (1972) In analyzing whether a defendant was denied due process of law, [courts] conduct a two step inquiry. *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006).  First, [courts] assess whether the identification was unnecessarily suggestive. *Id.*  If so, [courts] then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure.

*Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007).  The question on review of an unnecessarily

suggestive pretrial procedure is

> "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977).  *Manson* sets forth five factors for consideration in determining whether a suggestive identification was nevertheless reliable:  (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification. *Id.* at 114;  *see also Neil*, 409 U.S. at 199-200.

*Id.*

---

[1]  Respondent argues that Petitioner's claim is procedurally defaulted because the state appellate court relied on Petitioner's failure to object in the trial court.  The Court will excuse the alleged procedural default because it is more efficient to address the merits of Petitioner's claim than to analyze it under the doctrine of procedural default.  Procedural default is not a bar to substantive review of a meritless claim. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006); *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

Petitioner alleges that the pretrial identification procedures were unduly suggestive because he was the only person without a shirt in the photo array shown to Dixon. Although the fact that Petitioner wore no shirt in the photo array distinguished him from the other men in the array, there was no evidence that the man who killed Cornell Smith was shirtless at the time of the murder. "[U]nless the witness described the distinctive characteristic to the police beforehand, that characteristic is not a basis for finding a lineup unduly suggestive." *Howard v. Bouchard*, 405 F.3d at 471. Furthermore, all the men in the subsequent live line-up were approximately the same height and were dressed alike.

Petitioner also alleges that the pretrial procedures were suggestive because he was the only person who appeared in the photo array and in the live line-up, which Carl Dixon viewed. It does not appear that Dixon was influenced by Petitioner's appearance in both the photo array and the live line-up. He did not mention that fact, and it is plausible that he did not even notice the coincidence. Petitioner was one of five people in the photo array and one of seven people in the live line-up. His photo was the fourth one in the pack of five photos, and he was position number three in the live line-up.

This is not a case where the police, in essence, repeatedly said to Dixon, "This is the man," or where "the pretrial confrontations clearly were so arranged as to make the resulting identifications virtually inevitable." *Foster v. California*, 394 U.S. 440, 443 (1969). Dixon's failure to identify Petitioner with certainty in 1980 may somewhat undermine the reliability of his in-court identification made twenty years later, but it is not fatal. "An earlier failure to identify can be considered in judging the weight of the in-court identification and may be considered as one factor affecting the reliability of the earlier identification. Standing alone, it does not make the earlier

identification unreliable under the *Biggers/Manson* due process inquiry." *Howard v. Bouchard*, 405 F.3d at 484. The Court concludes that the pretrial identification procedures used with Carl Dixon were not unnecessarily suggestive or a violation of Petitioner's right to due process.

### 2. Gail Johnson and Roy Wilkinson

Petitioner contends that there was no independent basis for the identifications by Gail Johnson and Roy Wilkinson. However, neither Johnson nor Wilkinson identified Petitioner at trial. Ms. Johnson merely testified that, in 2000, a detective showed her a picture of the 1980 line-up and that she identified the third person in the line-up (Petitioner) as the person who hit Cornell Smith with a bat on July 31, 1980. Mr. Wilkinson testified similarly. He claimed that the third person in the photograph of the lineup had eyes similar to the person he had seen with a bat on July 31, 1980. Because neither Johnson nor Wilkinson made an in-court identification of Petitioner, there is no basis for Petitioner's claim that the pretrial identification procedures gave rise to irreparable misidentification at trial.

The Court acknowledges that Detective Mattison may have told both Johnson and Wilkinson that he thought the suspect was in the photograph of the line-up. Although such comments are ill advised, a line-up is not impermissibly suggestive simply because the police informed a witness that the suspect is in the line-up. *Jenkins v. City of New York*, 478 F.3d 76, 93 (2nd Cir. 2007) (citing *Sales v. Harris,* 675 F.2d 532, 538 (2d Cir. 1982)).

> [A]ny witness to a crime who is called upon to view a police lineup must realize that he would not be asked to view the lineup if there were not some person there whom the authorities suspected. To ignore this fact is to underestimate average intelligence. Thus, telling this to a witness may in many instances be relatively harmless.

*United States v. Gambrill*, 449 F.2d 1148, 115 n.3 (D.C. Cir. 1971).

Here, there is no evidence that Mattison's comment influenced Gail Johnson or Roy Wilkinson to pick Petitioner out of the seven people in the photograph of the line-up. Johnson recognized Petitioner almost immediately, and Wilkinson was influenced by Petitioner's eyes and facial expression. The admission of Johnson's and Wilkinson's identification testimony did not deprive Petitioner of a fair trial.

### 3. Warrantless Arrest

Petitioner alleges next that all the identification testimony should have been suppressed as the fruit of a warrantless arrest. This Fourth Amendment claim is not cognizable on habeas review, because the Supreme Court held in *Stone v. Powell*, 428 U.S. 465, 482 (1976) that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." For a "full and fair" opportunity to have existed, "the state must have provided, in the abstract, a mechanism by which to raise the claim and the presentation of the claim in this case must not have been frustrated by a failure of that mechanism." *Gilbert v. Parke*, 763 F.2d 821, 823 (1985) (citing *Riley v. Gray,* 674 F.2d 522, 526 (6th Cir. 1982)).

In Michigan, defendants in criminal cases may move to suppress evidence before or during trial and even on appeal. *See People v. Ferguson*, 135 N.W.2d 357, 358-60 (1980); *People v. Harris*, 291 N.W.2d 97, 99 (1980). Although Petitioner did not move to suppress the in-court identifications, there was no failure of the mechanism for raising Fourth Amendment claims: "All that *Stone v. Powell* requires is an 'opportunity' for full and fair consideration of the claim for suppression; it is up to the claimant and his counsel to decide what use, if any, is to be made of the

opportunity." *Jennings v. Rees*, 800 F.2d 72, 77 (6th Cir. 1986). Because Petitioner had a full and fair opportunity for presentation of his Fourth Amendment claim in state court, this Court is not required to address the substantive merits of his claim.

### 4. Absence of Counsel

Petitioner alleges that the identification testimony should have been suppressed because there was no attorney present in 1999 or 2000 when witnesses were shown a photograph of the 1980 line-up. This claim lacks merit because,

> [i]n *United States v. Ash,* 413 U.S. 300 (1973), the [Supreme] Court held that the Sixth Amendment does not require that defense counsel be present when a witness views police or prosecution photographic arrays. A photographic showing, unlike a corporeal identification, is not a "trial-like adversary confrontation" between an accused and agents of the government; hence, "no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary." *Id.*, at 317.

*Moore v. Illinois*, 434 U.S. 220, 227 n.3 (1977). Thus, Petitioner had no constitutional right to an attorney at the showing of the photograph of the 1980 line-up.

Whether Petitioner had a right to counsel under state law is irrelevant because "federal habeas corpus relief does not lie for errors of state law . . . ." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241 and *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)).

### 5. Trial Counsel

Petitioner alleges that his trial attorney was ineffective for failing to object at trial or to move to suppress the in-court identifications of him. He claims that all pretrial and in-court identifications

should have been suppressed as suggestive and as fruit of a warrantless arrest.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

### a.  The Pretrial Identifications

Petitioner has failed to show that the pretrial identifications of him were suggestive. Therefore, defense counsel was not ineffective for failing to move to suppress the pretrial identifications on that basis.  An attorney is not ineffective for failing to raise a meritless claim. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001); *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005), *cert. denied*, 546 U.S. 1137 (2006).

### b.  The Fourth Amendment Claim

"It is well settled, and beyond re-examination that a police officer must, save a few narrow exceptions . . . , have either an arrest warrant or probable cause to arrest." *Corcoran v. Fletcher*, 160 F. Supp.2d 1085, 1092 (C.D. Cal. 2001).

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.  [The Supreme Court has] stated, however, that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,"  and that the belief of guilt must be particularized with respect to the person to be searched or seized.

*Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted); *see also Brinegar v. United*

*States*, 338 U.S. 160, 175-76 (1949) (explaining that "[p]robable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed"). The prohibition against warrantless entry of a person's home to make an arrest does not apply when voluntary consent has been obtained. *United States v. Ayoub*, __ F.3d __, __, No. 06-1610, 2007 WL 2323848, at *2 (6th Cir. Aug. 16, 2007).

On the night of the murder, Wylene Betty Bennett overheard Petitioner nervously tell her son that he had killed someone. Ms. Bennett relayed this information to her brother, Harold West, who was a municipal police officer. Subsequently, consent was given to enter Petitioner's residence, and the police took Petitioner into custody. Carl Dixon then viewed a lineup and said that Petitioner looked and sounded like the person who had assaulted him at Woodward School. When viewed together, the facts provided probable cause to believe that Petitioner was the person who killed Cornell Smith at Woodward School. Therefore, defense counsel was not ineffective for failing to challenge Petitioner's warrantless arrest, and the state court's conclusion that defense counsel was not ineffective was not contrary to, or an unreasonable application of, *Strickland* or *Morrison*.

### B. The Trial Court's Findings

The third habeas claim alleges that the trial court's factual findings were clearly erroneous. Petitioner disputes the trial court's findings that Gail Johnson and Carl Dixon were credible witnesses. The Michigan Court of Appeals found no merit in this claim.

Petitioner has not cited any federal constitutional law in support of this claim, and in state court, he merely argued that the trial court's factual findings were clearly erroneous under state law. The alleged violation of state law is not a basis for granting habeas relief. *Lewis v. Jeffers*, 497 U.S.

at 780; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (citing 28 U.S.C. § 2254(e)(1)). The prosecutor admitted in his opening statement that the testimony would contain some inconsistencies and things that he could not explain. The trial court also acknowledged certain inconsistencies in the facts. The trial court stated, however, that "in the essential elements of what happened -- the essential actions that took place -- there was a true consistency among the witnesses from these various backgrounds and times and places." (Trial Tr. at 831.). The trial court found the disagreements to be on matters that were either ancillary, nonessential, or minor. Having reviewed the relevant materials, the Court concludes that the trial court's findings of fact constituted a reasonable determination of the facts. The trial court's resolution of credibility issues is entitled to special deference, *Patton v. Yount*, 467 U.S. 1025, 1038 (1984), and its choice between two permissible views of the evidence cannot be clearly erroneous. *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). Therefore, Petitioner's claim has no merit.

### C. The Right to Present a Defense

The fourth habeas claim alleges that the trial court violated the Michigan Rules of Evidence and interfered with Petitioner's right to present a defense when the court prevented defense counsel from impeaching two witnesses with their prior convictions. The witnesses in question were Gail Johnson, who had a prior conviction for first-degree retail fraud, and Donald Garland who had a prior misdemeanor conviction for conspiracy to commit false pretenses under $100.00 and a prior felony conviction for uttering and publishing.

Defense counsel did not attempt to impeach Donald Garland with his criminal history, but

when counsel attempted to impeach Gail Johnson with her prior record, the trial court refused to allow the questions. The trial court noted that defense counsel had failed to comply with a pretrial order requiring motions for impeachment evidence to be filed no later than the first day of trial. The Michigan Court of Appeals determined that the trial court's ruling did not amount to an abuse of discretion.

"Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991)). However, the right to due process in a criminal trial is, in essence, the right to defend against the State's charges. *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973). The Constitution "prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).

The attorneys were unable to agree on whether Ms. Johnson's prior conviction was a misdemeanor or felony, and the trial court opined that there could be a number of unimpeachable offenses in Ms. Johnson's criminal history. Thus, the exclusion of evidence of Johnson's prior conviction served a legitimate purpose, and it was not disproportionate to the goal of avoiding unnecessary delays during trial.

Even if the trial court's ruling on impeachment of witnesses violated Petitioner's right to defend, the error could not have had a "substantial and injurious effect" on the trial court's decision regarding Petitioner's guilt or innocence. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The

omitted evidence did not "create[] a reasonable doubt that did not otherwise exist," given Petitioner's admissions to close friends and relatives that he killed a man. *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver,* 255 F.3d 45, 57 (2d Cir. 2001)), *cert. denied*, __ U.S. __, 127 S. Ct. 1336 (2007). Thus, Petitioner is not entitled to relief on the basis of his claim that he was prevented from impeaching witnesses with their prior convictions.

### D. The Expert Witness on Identification

Petitioner alleges next that he was denied his right to an expert witness on questionable identification testimony. "[A] habeas petitioner does not have a constitutional right to the presentation of expert testimony on the reliability of eyewitness identification." *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001) (citing *Moore v. Tate,* 882 F.2d 1107, 1110 (6th Cir.1989)). Furthermore, the record indicates that the trial court granted Petitioner's motion to hire an expert witness. The witness declined to review the case because of limitations on the reimbursement of expenses. Petitioner alleges that the trial court limited the expert witness's fee without giving individualized consideration to the case. However, neither Petitioner nor defense counsel made a request for additional funds, nor asserted that they were unable to retain an expert for the authorized amount. *Lewis*, Mich. Ct. App. No.230887, at 5. The Court concludes that Petitioner was not deprived of his constitutional rights to due process and to defend himself.

### E. Perjury

The sixth habeas claim alleges that the prosecutor knowingly and intentionally presented false testimony and thereby deprived Petitioner of his right to a fair trial. "To prevail on a claim that the government presented perjured testimony, [a defendant] must show '(1) that the statements were

actually false; (2) the statements made were material; and (3) [the] prosecution knew they were false.'" *United States v. Pierce*, 62 F.3d 818, 834 (6th Cir. 1995) (quoting *United States v. Farley*, 2 F.3d 645, 655 (6th Cir. 1993)).

Petitioner contends that Carl Dixon committed perjury when he testified that the suspect went to his car and grabbed a bat. According to Petitioner, this testimony conflicted with Dixon's statement to the police in 1980 and in 1999 when he claimed that he did not know whether the suspect was holding anything.

Petitioner contends that Officer Heckman committed perjury when he testified that it was Carl Dixon who provided a description of the suspect's vehicle as being a blue, four-door Ford Granada with spoke wheel covers. Petitioner contends that this description of the vehicle differed from the description in the actual police report and that another witness provided the description attributed to Dixon.

Discrepancies in the evidence could have been due to a mistake, confusion, forgetfulness, carelessness, or something else. Mere discrepancies in testimony fall short of establishing perjury and do not establish that the government knowingly used perjured testimony. *United States v. Griffin*, 194 F.3d 808, 819 (7th Cir. 1999) (quoting *Unite d States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1997)). Therefore, the state court's conclusion that Petitioner's claim lacked merit was objectively reasonable.

## IV. Conclusion

The state court's factual determinations were reasonable and its legal conclusions were not contrary to, or unreasonable determinations of, Supreme Court precedent. Accordingly, the application for a writ of habeas corpus is DENIED. The Court DECLINES to issue a certificate of

appealability because reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).


                                        s/Lawrence P. Zatkoff
                                        LAWRENCE P. ZATKOFF
                                        UNITED STATES DISTRICT JUDGE

Dated:  September 27, 2007

                            CERTIFICATE OF SERVICE

        The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on September 27, 2007.


                                        s/Marie E. Verlinde
                                        Case Manager
                                        (810) 984-3290